JOHN M. GALLOWAY, Executor, and others, v. W. B. CARTER, JR., and others, Executors.

*Construction of Wills—Defeasible Estates.*

1. A testator, by his will, after first making provision for his wife, and then for his children, severally, and in order, giving each in severalty certain lands in fee, besides slaves and other personalty, directed that all his property, real and personal, not specifically disposed of, should be sold, and out of the proceeds, after payment of certain pecuniary legacies, one thousand dollars should be paid to each of his said children, and the residue divided equally between his wife and children. After the above provisions, is the following clause: " My will further is, that if any or either of

my children should die without leaving issue living at his, her, or their death, the share or shares, of him, her or them, so dying (as well the accruing as the original share) shall be, go over and remain to the surviving brothers and sisters and the child or children of such of them as may be then dead, equally to be divided between them share and share alike; but the children of my deceased child shall, in such case, represent their parents respectively and take in families ;" *Held,* that the will did not vest an absolute and fee simple title to any of the property in a child of the testator living at his—the testator's—death ; but upon the death of such child, leaving no issue, *all the property* to which such child was entitled under the will, went over to and became the property of the surviving brothers and sisters, and the child or children of such of them as were then dead, to be divided among them *per stirpes.*

2. Where the estate created by a will is defeasible, and the intention of the testator is doubtful, and the property itself is given, and not the mere use of it, and the time is not definitely fixed at which the estate shall become absolute, if there be any intermediate period between the death of the testator and that of the devisee or legatee, at which the estate may fairly, in view of the whole will, be considered absolute, this time will be taken as that intended by the testator ; but if there be no such intermediate period, and the time of the devisor's death, or that of the devisee's or legatee's death must be adopted, the former will be treated as the time intended.

3. The general rule is to construe the estate, whether vested or contingent, as absolute and indefeasible, rather than defeasible ; and if it cannot be construed to be absolute, then to construe words which make it doubtful, as to when the estate shall become absolute, in such manner as to render the estate absolute at as early a period as can be fairly done.

4. The above rules do not apply when a contrary intention appears from the whole will—its terms, phraseology, several parts, provisions, conditions, and their bearing upon each other.

5. It is not the object of rules of interpretation to direct, modify or prevent the intention of the testator, but to ascertain what it is and make it effectual.

(SMITH, C. J., dissented).

CIVIL ACTION, tried before *MacRae, J.,* at August Term, 1886, of STOKES Superior Court.

Judgment for defendants.   Plaintiffs appealed.

It appears that Robert Galloway died, in the County of Rockingham, in the year 1832, leaving a last will and testament, which was duly proven, and the executors therein named, duly qualified as such.   The following is a copy of the will:

In the name of God, amen:   I, Robert Galloway, of Valley Field, in Rockingham County, North Carolina, do make and publish this paper writing as my last will and testament, hereby expressly revoking all former wills by me made.

I give and devise to my beloved wife, Mary S. Galloway, my manor plantation, and the lands thereto belonging, called "Valley Field," and containing about twelve hundred acres, for and during the term of her natural life; and I give absolutely to her the following slaves, namely: Hubbard, Joe, Dick (the miller), Jerry (who has been employed at the court-house), Patrick, my old and faithful servant and friend, Isaac (who lives at the court-house), Isaac (at the Eagle Falls), Lorenzo, William (purchased from Fitzgerald), Reuben, James, Nancy, Elsey, Tamer, Diana and her three youngest children, named Grochus, Nancy and Polly; Leanthea, Alice, Dorcas and her child Betsey; Allen, Philip (at the court-house), and Sylla and Delilah, two children of Nancy; and also my household furniture and kitchen utensils, at Valley Field; my farming implements and utensils, wagons, carts, plows, gear, and the like; stock of horses, cattle, hogs and sheep, and all my crop and provisions on hand, and the crop growing on that plantation at my death; also my twenty-two shares of stock in State Bank of North Carolina, and the sum of one thousand dollars in money, to be paid as she may require it.   But I further direct that my wife shall furnish my sons, Thomas and Rawley, and my daughters, Mary and Elizabeth (if not done in my life-time), with three beds and furniture each, and for that purpose

she may take eight beds and furniture from the court-house; I also give her my carriage and horses.

I give to my son Charles the tract of land called "Rose Hill," situated on Dan River, on which he resides, containing about thirteen hundred acres, in fee simple; also, the following negroes, to-wit: Reuben, Anthony, Winnie, Philip, Tilda, Pinkney, Nancy, Isaac (son of Phillis), Lethe, George, Alsey, daughter of Edy, and Billy; also, all the furniture, household, kitchen and farming utensils, crops on hand or growing on said plantation, and the stocks of all kinds there belonging.

I give to my son Robert, in fee simple, the tract of land situated on Dan River called "Eagle Falls," containing about one thousand twenty-five acres; also, the following negroes, to-wit: Armistead, Sam, William, Jerry, Delia, Branton, Dochia, Mary, Dick, Alley, Joe and Tom; also, all the household and kitchen furniture in his possession at Eagle Falls, or Spring Garden, and all farming utensils, crops on hand or growing at Eagle Falls, and the stocks of all kinds there belonging.

I give to my daughter Marion, wife of James E. Galloway, in fee simple, the following tracts of land, situated in the Western District of Tennessee, viz.: One tract on the Obion River, which James Martin conveyed to me, being part of a five thousand acre tract, called the "Big Clover Lick;" and one other tract, containing about one thousand three hundred and nine and a half acres, lying on the waters of Loore Hatchee River, in Fayette county, which the said James E. conveyed to me; also, the following negro slaves, to-wit: Daniel (whom the said James E. hath already sold by my consent), Peter, young Hubbard, Lewis, Bob, Henry, Lucy, Hester, Lucinda, Milly, Abbey and Lavinia, and all the furniture, stock and other perishable property which I put into possession of her said husband.

I give unto my son Thomas three tracts of land, situated

on Dan River, adjoining each other, which I purchased from Daniel Worsham and Joseph Crook, and the heirs of Gideon Rooche (the latter of which was conveyed to him, my said son), containing altogether about one thousand acres, in fee simple; also, the following negroes, to-wit: Tom (purchased from W. Leary), Stephen, George, Sam, Hannah, Luke, Armstrong, Martha, Hannah, Esther, Sophy and Lucretia, and all such stocks of any kind, household and plantation utensils, as I may in my life-time place on said land, or put into possession of my said son Thomas.

I give to my son Rawley, in fee simple, a tract of land which I purchased from Theophilus Long, situated on Dan River, containing about three hundred acres, with all implements of husbandry, and all the stocks thereon, and the crops thereon growing at my death; also, my manor plantation, called "Valley Field," in fee simple, in reversion after his mother's death; and also the following negroes, namely: Henry, son of Tamer, Hubbard, son of Maria; William, son of Dinah; Harrison, Washington, July, Edy, Shelton, Aggy and Henderson; Elijah, Martha, daughter of Tamer; Elias. I also give my son Rawley, in fee simple, a tract of land adjoining the Lacy tract, conveyed to me by the executors of Martha Scales, and containing about sixty acres, making that whole tract about three hundred and sixty acres, or thereabouts.

I give my daughter Mary S. the land which I purchased ffom Barnes; also that purchased from George Barnes; also that purchased from William Pratt, that purchased from Stephen Pratt and John Robinson, and that purchased from John Strong, containing about six hundred acres, more or less, in fee simple; also the following negroes, to-wit: Henry, purchased of William Buck; James, son of Bridget; Anthony, son of Winnie; Judah, Mary Ann, Phœbe, Bridget; Abram, son of Diana; Catherine, Dorre, Ann and Nelson, son of Dorcas, at the court-house.

I give to my daughter Elizabeth, in fee simple, the tract of land called "Barnes tract," containing about eight hundred acres, which was conveyed to me by the Clerk and Master in Equity for the county; and also the following negroes, to-wit: Martha, Jefferson, Adam, David, Bonaparte, Peggy, Minerva, Adeline, Harrison, son of Peggy; Dorcas and her son Lewis, and Abbey, daughter of Tamer. I also give to each of my said two daughters, Mary and Elizabeth, the sum of four thousand dollars in ready money, and a horse and saddle, to be raised out of my estate, as hereinafter directed. I further will and declare, that any issue belonging to me of any female slave herein bequeathed, which is now born, and which is not in this will particularly named, or which may be born before my death, and not otherwise disposed of by me, shall go and belong to the same person or persons to whom I have bequeathed the mother. This I direct, knowing that several already have children, and that others probably will have them.

I order and direct, that my tract of land, called "Austin's old place," situated on Dan River, opposite the Mulberry Island, and containing about five hundred acres, more or less, also my tract, called "Spring Garden," containing about two thousand one hundred acres, conveyed to me by James E. Galloway; and also the lands I purchased from Drury Williams and son, from Mitchell Pounds and Purtle, and all my lots, lands and houses near Rockingham court-house, and all the residue of my lands and real estate, not herein devised, and situated in North Carolina, which I own in my own right, or in company with others; and also all my lands situated in Tennessee, and all the residue of my specific personal estate, be sold by my executors, or such of them as may prove my will and act in its execution; which sales may be made at public auction, or by private contract, at the discretion of my said acting executor or executors, with this restriction: that no private sale shall be made to any or

either of my executors, but my said executors may be bidders and buyers at any public sale; and, in that event, the other executors may, and shall have power to convey the lands, or other things purchased by a co-executor, to him or them so buying, in the same manner as to any other purchaser; and I direct that sales of the Tennessee lands be made on a credit of one, two and three years; and out of the proceeds of such sales of my stocks of merchandise on hand, and other property not given away herein, my cash on hand, and debts owing to me, I order the expenses of the execution of my will to be paid, and the pecuniary legacies of my wife and daughters, Mary S. and Elizabeth; the residue thereof I give to my wife and all my children, equally to be divided between them, except that my wife is not to have any part thereof, until each of my children shall have received one thousand dollars out of this residue.

My will further is, that if any or either of my children should die without leaving issue living at his, her or their death, the share or shares of him, her or them so dying (as well the accruing as the original share) shall be, go over and remain to the surviving brothers and sisters, and the child or children of such of them as may be then dead, equally to be divided between them, share and share alike; but the children of my deceased child shall, in such case, represent their parents respectively, and take in families.

I appoint my four sons, Charles, Robert, Thomas and Rawley, the executors of this my last will and testament, and I enjoin it on them and all my children to live in harmony, and carefully to avoid all differences and disputes about my estate, being well assured that it would be more for their interest if I had nothing to leave them, rather than that what I do leave them should break brotherly love, and become subjects of contention among them.

Given under my hand, this the 8th day of December, 1831.

R. GALLOWAY.

Signed, declared and published by the testator in our presence, who attested the same in the presence of him and of each other, by his request.

> THOMAS RUFFIN,
> PETER WILSON,
> PETER H. DILLARD.

The daughter of the testator, Mary S. Galloway, named in the will, died in the month of March, 1886, never having been married and without issue, leaving a last will and testament, which was duly proven, by which she disposed of all her property, real, personal and mixed, including such as she acquired under the will of her father. The defendants are the executors, devisees and legatees of her will.

The plaintiffs are the surviving children of the testator, and others, who represent such of his children as are dead, and the purpose of this action is to obtain a construction of the will set forth above, an account, &c.

In the Superior Court, the defendants moved to dismiss the action, because the complaint does not state facts sufficient to constitute a cause of action. The Court sustained the motion, and gave judgment accordingly, and the plaintiffs, having excepted, appealed to this Court.

The following is so much of the case, settled on appeal, as shows the contention of the parties:

"The plaintiffs contended, that, under the said will, each child took a defeasible estate in fee in the lands and personal property devised and bequeathed to said child, and that upon the death of Mary S. Galloway, in 1886, without issue, living at her death, all her property and estate that was devised and bequeathed to her by Robert Galloway, her father, and the residue thereof, in her hands, vested, by way of executory devise, in the plaintiffs and individual defendants, (who are the children of the deceased children of said Robert Galloway,) as tenants in common thereof.

The surviving defendants, on the other hand, by demurrer *ore tenus*, contended, that, by a proper construction of the will of the said Robert Galloway, deceased, the land and personal property devised and bequeathed to Mary S. Galloway, was vested in fee simple, and absolutely, in the said Mary S. Galloway, upon the death of the testator; and that, as appears by the complaint, the said Mary S. Galloway had died, leaving a last will and testament, by which she disposed of her estate; and that the plaintiffs were not entitled to the relief demanded in the complaint."

*Messrs. Mebane & Scott,* for the plaintiffs.
*Messrs. Watson & Glenn,* for the defendants.

MERRIMON, J., (after stating the facts). The will before us, to be interpreted, is orderly in its form, very clear and intelligible—certainly in most respects—in its several provisions, and, of itself, affords evidence of an able and skillful draughtsman  By it, the testator carefully disposed of all his large and valuable estate, embracing much real and personal property, certainly and exclusively to his own immediate family, consisting of his wife and seven children, thus manifesting a settled purpose to devote his property, as far as practicable, to persons of his own blood.

It will be observed, that the testator first makes provision for his wife, and then for his children, severally, and in order, giving each, in severalty, certain lands in fee, besides slaves and other personal property. Having thus disposed of much the greater part of his property, he directs that certain lands, specified, be sold—part of them on a credit of one, two and three years—thus turning them and all his property, not specifically devised or bequeathed, into a cash fund, out of which he directs, first, that certain pecuniary legacies be paid to two of his daughters, named; secondly,

that each of his children be paid one thousand dollars; and thirdly, that the residue thereof be divided equally between and among his wife and children.    These dispositions embrace all his property, and he then adds :

" *My will further is, that if any, or either of my children, should die without leaving issue living at his, her, or their death, the share or shares of him, her, or them, so dying, (as well the accruing as the original share,) shall be, go over and remain to the surviving brothers and sisters, and the child or children of such of them as may be then dead, equally to be divided between them, share and share alike;* but the children of my deceased child shall, in such case, represent their parents, respectively, and take in families."

It is this clause of the will that gives rise to the questions presented for our decision.    The principal contention of the appellees is, that the testator intended that it should have application and operative effect only in case one or more of his children had died in his life-time, after the execution of his will; and that, as his daughter Mary S., now deceased, and under whose will they claim, survived him, her title to the property, devised and bequeathed to her, became absolute on the death of the testator.

Construing the will as a whole, as we must do, we cannot accept the interpretation thus insisted upon, as the correct one.

As contended by the learned counsel for the appellees, it seems to be settled—certainly in this State—that where the estate, created by the will, is defeasible, and the intention of the testator is doubtful—not clearly expressed—and the property itself is given, and not the mere use of it, and the time is not definitely fixed at which it shall be absolute, if there be any intermediate period between the death of the testator and that of the devisee or legatee, at which the estate may fairly, in view of the whole will, be considered absolute, this time will be taken as that intended by the testator; but if

there be no such intermediate period, and the time of his death, or that of the devisee or legatee, must be adopted, the former will be treated as the time so intended. This is so, unless there be words that forbid such interpretation, or considerations appearing from the will that clearly imply, or disclose, a different intent.

The general rule applicable in such doubtful cases is, to construe the estate, whether vested or contingent, as absolute and indefeasible, rather than defeasible; and if it cannot be construed to be absolute in its creation, then to so interpret words and phrases implying such conditions as render the estate defeasible, doubtful as to the time of their operation, so as to render the estate absolute at as early a period as can fairly be done. *Cox* v. *Hogg,* 2 Dev. Eq., 121; *Hilliard* v. *Kearney,* Bus. Eq, 221; *Biddle* v. *Hoyt,* 1 Jones Eq., 159; *Vass* v. *Freeman,* 3 Jones Eq., 221; *Davis* v. *Parker,* 69 N. C., 271; *Murchison* v. *Whitted,* 87 N. C., 465; *Price* v. *Johnson,* 90 N. C., 592.

But such rules of interpretation do not apply when, from the whole will—its terms, phraseology, several parts, provisions, conditions and their bearing upon each other, and just and reasonable implication arising thereupon—a different intention of the testator clearly appears. He might provide otherwise. Unquestionably, it is competent for him to devise and bequeath his property to his children, coupled— clogged—with the condition, that if one or more of them should die at any time before, or after, his death, without issue then alive, then, and in that case, it should pass to and become the property of his or her surviving brothers and sisters. The law, for reasons of wise and sound policy, does not favor such a disposition of property, but it does not forbid it, and, on the contrary, when it appears that such is the purpose of the testator, it will uphold and enforce his purpose. *Bullock* v. *Bullock,* 2 Dev. Eq., 307; *Fortescue* v. *Satterthwaite,* 1 Ired., 566; *Garland* v. *Watt,* 4 Ired., 287; *Biddle*

---

---

v. *Hoyt*, 1 Jones Eq., 159; *Motts* v. *Caldwell*, Bus. Eq., 289; *Webb* v. *Weeks*, 3 Jones, 279; *Vass* v. *Freeman*, 3 Jones Eq., 221; *Williams* v. *Cotten*, Id., 395.

The will, however it may dispose of property, not inconsistently with the rules of law and statutory regulations, will be upheld, and the intention of the testator must prevail. The law does not seek to mould or direct his purpose—on the contrary, it effectuates it as nearly as may be. Hence, it is no part of the object of rules of interpretation, such as those adverted to above, to direct, modify, or prevent the intention, but only to ascertain what it is, to the end it may become operative and effectual.

Now, in our judgment, the testator of the will under consideration, intended, by the clause of it above recited, to render the estate and title of the property devised and bequeathed to his several children, defeasible, and to provide that, in case any one or more of them should die at any time after the death of the testator, without leaving issue living, at his, her or their death, respectively, the property so devised and bequeathed, including any that might have accrued under the clause, should at once, upon his, her or their deaths respectively, at any time, go over to, and become the property of, the surviving brothers and sisters, and the child or children of such of them as may then be dead, equally to be divided among them, share and share alike, the children of any deceased child representing their parents respectively, and taking as families. This, we think, sufficiently appears from the clause just referred to. It provides, "that if *any or either* of my children should die without leaving issue living, at his, her, or their death," &c. These are comprehensive words, used in a broad sense—they do not imply, simply, that if one, two, or three shall so die, but if *any*—several—an indefinite number, at least five— shall so die. This is made clearer by the further provision, in this connection, that then " the share or *shares* of him or *them*, so dying, (as well the accruing as the original share,)

shall be, go over and remain to the surviving brothers and sisters, and the child or children of *such of them* as may be then dead," &c. The testator must have been a man advanced in life—he had a large family, seven children—and it appears from the will, that at least one of them was married, thus indicating that the children were not all very young, and the advanced age of the father. Is it probable— is it reasonable to infer, that he intended such provision to apply to such of his children as might die in his, the testator's, life-time? Reasonably, in the nature of the matter, did he contemplate that several of his children—perhaps as many as five—would have children, and die before himself, and he ought to provide for such a contingency? We cannot think so. To conclude that he did, would be to ignore the ordinary course of nature, in such respect, as well as the common experience and observation of men. *Hilliard* v. *Kearney*, Bus. Eq., 221, 231, 232.

Moreover, if the clause refers to the death of children in the life-time of the testator, then the words of it—" as well the accruing as the original share "—could have no practical meaning or purpose, because, in that case, the devise and bequests would lapse and become inoperative, and under the will, the property would pass into and become a part of the residuary fund, and thus go to the surviving brothers and sisters and their mother. But, if the clause applies to such death after the death of the testator, then the words, " as well the accruing as the original share," would serve the important purpose of certainly keeping the whole property in the family of the testator — devoting it exclusively to the benefit of his children and their children, as far and as long as he could. This, indeed, seems to have been his purpose. It cannot be said that the testator was *inops concilii*, and therefore, could not know with accuracy, the legal effect of such provisions. The will, upon its face, shows the contrary—that he was well advised how to effectuate his purpose, and that it was skilfully and very thoroughly drawn.

Then, as the provision of the clause last mentioned does not apply to such death of a child or children in the life-time of the testator, plainly, by its terms, it has reference and application to such death, after his death.   At such death of a child, his or her share, including any accruing share, would go over, as provided.   As the intention of the testator was that we have indicated, the argument, that his disposition of his property was unwise and inconvenient, and might result in injustice to some of his children, and has so resulted in the case of his daughter named, who died without ever having had issue, is without force.   He certainly had the right to dispose of it as he did, whatever may have been his motive and whatever the consequences.

It has been suggested, that the clause of condition and defeasance does not apply to all the devises and bequests of the will, but only to the bequests to be paid out of the fund to be raised from the sale of the land directed to be sold, and the personal property not specifically bequeathed. We cannot yield our assent to this view.   There is nothing, it seems to us, to warrant such, or any restricted application. The clause appears separately from any other, at the end of the clauses disposing of all the property, and begins thus: " My will further is"—that is, in addition to all the testator had provided—and then proceeds as follows: " That if any, or either of my children, should die without leaving issue living at his, her, or their death, the *share or shares* of him, her, or them," &c.   What share?   It is not designated or described in terms, by implication or inference, as the share of the fund last mentioned.   There are no words implying such, or any restriction, in this respect.   These bequests, in the clause granting them, are not designated as *shares*—nor are any of the devises or bequests so designated in the several clauses creating them.   Nor can we conceive of any adequate reason for such restricted application.   In the absence of terms or particular provision authorizing it, it is not probable, nor reasonable, as it seems to us, that the testator

would restrict the application to transitory pecuniary bequests, without some distinct provision for the purpose, and not to valuable devises, and bequests of slaves and other personal chattels, not at the time of the execution of the will so transitory. He would more likely apply such restriction to the devises and the bequests of slaves, but, as we have said, there is no such purpose expressed, and no apparent motive or purpose to make such restriction or distinction.

If it be said, that it is not likely the testator would intend to restrict his children in the exercise of the power to dispose of the property given them, the answer is, he had the right to do so, and in very sweeping terms, he exercised that right, manifesting, apparently, a settled purpose to devote his property to persons of his own blood. When such purpose appears upon the face of the will, the mere fact that its provisions may be unwise, inconvenient, and not what most men would make, cannot be allowed to affect, or give direction to, to the intention expressed. Nor is it at all probable, that a testator who prepared his will so cautiously and intelligently, would have omitted some expression, as to such restriction, if he intended it.

As we have said, the clause in question appears as a separate paragraph at the end of the clauses of the will, disposing of all the testator's property. In its terms, it is precise, apt, comprehensive, and thorough, for the purpose contemplated. There are no pertinent restrictive words—nothing appears to show that it was intended to apply to one class of gifts more than another. The term "*share*" is used without qualification. In its connection, it must mean share of the testator's estate—his whole property disposed of by the will, in which whole, each and all of his children shared. By a child's "share" was meant, his share of the whole—not his share of a part of the estate, else the testator would have said so. The clause is inserted in the will at the orderly and proper place, to apply to the whole of the property disposed of; it so applies in its terms, and nothing to the contrary appears

There is error. The judgment must be reversed, and further proceedings had in the action according to law. To that end let this opinion be certified to the Superior Court.

It is so ordered.

Error.                                                    Reversed.


SMITH, C. J., dissenting. The will, whose construction is the subject of controversy in this action, came from the hands of the late Chief Justice of this Court, THOMAS RUF-FIN, who is also an attesting witness to its execution, and must be read as a well considered and carefully prepared instrument, and not made, as many are, without intelligent advice, *inops consilii.* The dispositions of his estate among his seven children, observing an essential equality in the value of what he gives, are separate and distinct. Each devise is of land in fee simple, and each clause begins with words, "I give to," and then with the real estate a number of named negro slaves, and that perishable, personal property found on the devised farms, inclusive of implements of husbandry, furniture, stock and growing crops.

The devises to the daughters are of land and slaves, omitting the other articles given to the five sons, in lieu of which, he adds a legacy of $4,000 in money to each, and a horse and saddle to the two.

After this distribution of so much of his estate, intended in the several clauses that contain them, to be absolute and in perpetuity to each, follows the clause, beginning in a changed form of expression: "I order and direct that my tract of land, called Austin's Old Place," &c., in which the residue of his property is to be aggregated into a sum of money, which the testator expected it would require a considerable time to bring about, since the lands in Tennessee were to be sold on a credit of one, two and three years, and therefrom were to be paid the expenses of administration and the money legacies ($9,000), to his wife and daughters,

and what remained he directs to be divided between his wife and children, except that each child should have therefrom $1,000 before his wife shall participate in the distribution.

Then follows the clause, whose legal application and operation form the subject of contention, abruptly introduced: "My will further is, that if any or either of my children should die without leaving issue living at his, her or their death, the share or shares of him, her or them so dying, (as well the accruing as the original share) shall be, go over, and remain to the surviving brothers and sisters, and the child or children of such of them as may be then dead, equally to be divided between them, share and share alike; but the children of any deceased child shall, in such case, represent their parents, and take in families."

In the argument, two repugnant methods of interpreting this last clause were pressed, with references to adjudged cases, upon our attention. One, that the limitation was upon all the preceding dispositions, and the contingency attached to each, at the time of the death of the several devisees and legatees, whenever that event should happen.

The other, that the contingencies were confined to the testator's own life-time, and ceased to affect the property at his death.

From a careful and critical study of the will, my mind has been brought to a different conclusion as to the intent of the testator, and the form in which it finds expression.

It is, I think, plain, that the testamentary gifts were to take present effect, when the testator died, and were then to become absolute and unconditional.

The estates in the lands are everywhere declared to be " in fee simple," and can it be supposed that stock, farming utensils, slaves, and even growing crops, most of it, if not all, worn-out or consumed in the use, were to be accounted for, as in the present case, after a lapse of more than fifty years ? Can it be attributed to the learned and accurate draftsman, who put

the testator's purposes in shape, that such a construction should be given to his work?

Were not the large legacies in money, an offset to what the brothers got beside land and slaves, to be as absolute and unconditional as those for which they were substituted, to make all equal? Such a construction is compatible with the general and controlling purpose apparent in all the antecedent donations.

Again, the words used in passing from the next preceding, to the clause which gives rise to the controversy, are quite different from those that mark the transition in the others. The beginning of the limiting clause, "My will further is," seems to indicate an unfinished disposition of the residuary fund, now to be supplied.

The term implies *incompleteness* in what goes before, and is not at all appropriate to those well defined and clear devises and bequests before made to the children separately, and must be supposed to have significance in the carefully drawn instrument. The reason of the discrimination is apparent. The previous donations are absolute. The residuary fund would require years, after the testator's death, to be reduced to a condition that would admit of division. Meanwhile, some might die, and as this provision was for the common benefit of the children as a *class*, rather than as *individuals*, it was intended to secure the fund to the survivors and the issue of such as died leaving issue, at the period when distribution was to be made, thus confining the contingencies to the intervening period, and making the bequests, when received, unconditional.

This view derives additional support from the description of the property thus limited. The contingent limitation is confined to "*shares*," original and accruing, a word aptly designating an interest in a common fund, not property separately and independently given. "Shares," in a strict sense, means a fractional or partial interest in a common fund

held by several, and hence, peculiarly applies to the residuary fund, to be apportioned among the legatees, in the future, who would be entitled under the prescribed conditions.

This construction derives support also from the case of *Cox* v. *Hogg*, 2 Dev. Eq., 121, decided in 1831, just before the will was drawn, and in which the leading opinion is delivered by the eminent Judge who drew it. In this case, the disputed bequest was in these words: "My negroes I wish divided equally among my wife, Louisa, Nancy, Olivia and the child of which my wife is pregnant, and in the case of the death, that third share be equally divided among the survivors, and also the remaining parts of my estate; providing in all cases that Lucy Drew (a child who had incurred her father's displeasure) shall never inherit one stiver, in the case of the death of either of the above children, or wife."

This was a disposition and limitation of common property, and would, perhaps, have been construed, as in *Hilliard* v. *Kearney*, Busb. Eq., 221, but for the disinheriting provision which might otherwise let in the daughter Lucy, as confining the contingencies to the testator's own life and to the first death among the legatees. After reciting numerous cases from the English reports, the Judge says: "Upon their authority, I conclude, however unnatural that construction may be, when another period may be collected, not destructive of *the tenancy in common*, yet that it is to be taken as natural and reasonable, and intended, when opposed to the still more unnatural one of a survivorship indefinitely, whereby the whole estate accumulates for one."

The opinion concludes: "I am therefore of opinion that upon the death of the testator, which was, in this case, *the period for the vesting and division*, the legacies became absolute to his wife, and such of his children as were then living."

HALL, J., expresses himself in the same case thus: "In the present case, it might not be considered as going far out

100—9

of the way, to believe that the testator meant this : that if either of the legatees should die before (in common parlance) they got their legacy, or before it vested in them, then the survivors should have it.   However, the doctrine seems so well established, that words of survivorship *added to a tenancy in common*, are so construed as to prevent a lapse, and become inoperative at the death of the testator; that questions of that description may be considered as put to rest."

He cites a long array of authorities for the proposition.

These extracts are reproduced from the exhaustive discussion which the subject underwent, to show that, as in *Hilliard* v. *Kearney*, where the discussion was not less thorough, the rule prevails in limitations of survivorship among tenants of property, given to them in common; and further, that soon after the decision, the present will was prepared by one of the Judges who participated in making it, and who had become familiar with the rules of construction applied to such testamentary dispositions.

To extend the limitations to all of the property given, and restrict the defeating contingencies to the testator's life-time, would be to provide, by will, precisely what the law would have done upon the event, without any testamentary direction; an unnecessary provision, which it can scarcely be supposed the draftsman would have inserted.

To embrace all the property, and tie it up until the death of the donee, whenever that might occur in the uncertain future, is inconsistent with the evident intent that each donee of a separate portion of the estate should have it absolutely, to use and dispose of as his own, and is wholly irreconcilable with so much of it as that the use and property are inseparable.

This is a fair and reasonable interpretation of the will, in harmony with its whole structure and the intention developed in the language used, to give it force and effect.